**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

**OHIO VALLEY ENVIRONMENTAL
COALITION, INC., et al.,**

        **Plaintiffs,**

        **v.**                    **CIVIL ACTION NO. 3:10-cv-836**

**INDEPENDENCE COAL COMPANY, INC., et
al.,**

        **Defendants.**

**<u>PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS'
RESPONSE TO DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT</u>**

**<u>INTRODUCTION</u>**

Defendants raise four arguments in opposition to Plaintiffs' pending motion for partial

summary judgment, the last of which also serves as the sole ground for Defendants' cross-

motion for partial summary judgment.  First, Defendants argue that the Court should not rule on

Plaintiffs' pending motion until after a ruling on their motion to consolidate this action with an

action pending against other Massey Energy subsidiaries in the Charleston Division of this

Court.  Second, Defendants argue that Plaintiffs' members' declarations are not sufficient to

establish injury-in-fact for standing purposes.  Third, Defendants argue that Plaintiffs are

required to, but did not, establish that the streams receiving their selenium discharges are waters

of the United States.  Finally, Defendants argue that their selenium limits have not gone into

effect, depriving this Court of jurisdiction and supporting summary judgment in their favor.  As

explained below, each of Defendants' arguments is meritless.

///

## ARGUMENT

### I.      Defendants' Motion to Consolidate Has Been Denied

In their response to Plaintiffs' motion, Defendants requested that this Court stay a ruling

on Plaintiffs' motion for partial summary judgment in reliance on a motion that other Massey

Energy subsidiaries had filed in an action in the Charleston Division.  Specifically, Defendant

Independence Coal Company ("Independence") and several of its sister companies had filed a

motion in Sierra Club, et al. v. Elk Run Coal Co., et al., Civil Action No. 2:10-673 (hereinafter,

"the Charleston action"), requesting that Judge Copenhaver consolidate the Charleston action

with this action and transfer the consolidated action to the Charleston Division of this Court.

(Civ. No. 2:10-cv-673, Doc. # 15).  On the basis of that motion, Defendants in this action urged

that "this Court should refrain from ruling on Plaintiffs' current Partial Motion for Summary

Judgment until Judge Copenhaver rules on the Motion to Transfer/Consolidate."  Ds' Memo. at

6-7.  On October 1, 2010 (the day after Defendants responded to Plaintiffs' motion for partial

summary judgment), Judge Copenhaver denied the Motion to Transfer/Consolidate in the

Charleston action.  Civ. No. 2:10-cv-673, Doc. # 35 (attached as Ps' Reply Ex. 1).

Consequently, Defendants may no longer rely on their Motion to Transfer/Consolidate to support

a stay of proceedings in this action.  Indeed, Defendants recognized this scenario in their

response brief, stating that, "[i]f the Motion to Transfer/Consolidate is denied, this Court may

then enter a ruling on [Plaintiffs' summary judgment] motion."  Ds' Memo. at 7.  As a result,

Defendants' first argument is essentially moot.[1]

---

[1] Recognizing this possibility, Defendants obliquely suggest in a footnote that the pending motion to dismiss in the
Charleston Division "further support[s] a stay."  Ds' Memo. at 8 n. 3.  That motion to dismiss asserts only that the
concluded enforcement action by US EPA against Massey Energy subsidiaries precludes the Charleston action.  As
this Court noted in Ohio Valley Envtl. Coalition v. Hobet Mining, LLC, such a preclusive effect does not exist
where the prior governmental enforcement action does not involve the same pollutant, i.e., selenium.  2010 WL
1286652 (S.D. W. Va. Mar. 29, 2010).  In denying the Motion to Transfer/Consolidate, Judge Copenhaver observed
that the plaintiffs had offered "persuasive reasons why the Massey consent decree has no particular impact upon the

## II.      Plaintiffs' Members Have Established Injury-in-Fact

Defendants argue that Plaintiffs are not entitled to summary judgment because they have not sufficiently established "future use" of the affected streams.  Ds' Memo. at 8.  Defendants maintain that, under the Supreme Court's opinion in <u>Summers v. Earth Island Institute</u>, 129 S. Ct. 1142 (2009), Plaintiffs' members' declarations are inadequate to "specify an imminent future injury."  Ds' Memo. at 9.

In <u>Summers</u>, environmental groups sought judicial review of forest service regulations that exempted salvage timber sales from notice, comment, and appeal.  129 S. Ct at 1147. Although the challenge originally involved a specific timber sale in the Sequoia National Forest, the parties ultimately settled their dispute regarding that particular application of the challenged regulations.  <u>Id.</u> at 1147-48.  The environmental groups still sought review of the regulations implicated by the settled timber sale, and the Ninth Circuit upheld the district court's nationwide injunction against their application.  <u>Id.</u> at 1148.

The Supreme Court articulated the question presented to it as "whether [the environmental groups] have standing to challenge the regulations in the absence of a live dispute over a concrete application of those regulations."  <u>Id.</u> at 1147.   The Court held that they did not because the affidavit on which the environmental groups relied "was not tied to application of the challenged regulations, . . . does not identify any particular site, and  . . . it relates to past injury rather than imminent future injury."  <u>Id.</u> at 1150.

Plaintiffs' amended declarations are sufficient to establish standing for two reasons.

---

Huntington action, not the least of which is their contention that the Massey consent decree 'was not intended to and did not address Defendant's selenium discharges.'"  Ps' Reply Ex. 1 at 5.

Nonetheless, because Defendants have incorporated by reference their argument set forth in support of the Motion to Dismiss the Charleston action (see Ds' Memo. at 8 n.3), Plaintiffs hereby incorporate by reference their response to that motion.  For convenience, that response is attached to this brief as Plaintiffs' Reply Exhibit 2.

First, in a Clean Water Act citizen-suit such as this one, the analysis is different than the analysis applicable in <u>Summers</u>.  Second, even if <u>Summers</u> were to control the analysis, Plaintiffs amended declarations satisfy its strictures.

### A.  In a CWA Citizen-Suit, Curtailment of Use Is Sufficient

Defendants' argument based on <u>Summers</u> asserts that Plaintiffs declarations "do not adequately specify the members' plans to return to the allegedly affected area."  Ds' Memo. at 9. Plaintiffs' members do not need imminent plans to return to the affected area, however, under <u>Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.</u>, 528 U.S. 167 (2000). <u>Laidlaw</u> squarely presented the Supreme Court with the question of what it takes to establish standing in a Clean Water Act citizen suit.  The Court expressly held that curtailment of use of the polluted waterway is sufficient, explaining that statements of conditional use—<u>i.e.</u>, "I would use the stream but for the pollution"—cannot "be equated with the speculative some day intentions to visit endangered species halfway around the world that we held insufficient to show injury in fact in <u>Defenders of Wildlife</u>."  <u>Laidlaw</u>, 528 U.S. at 167 (internal quotation marks omitted).  In that way, standing in a Clean Water Act citizen suit is qualitatively different than standing in a case seeking judicial review of government action, such as <u>Summers</u>.  Whereas <u>Summers</u> dealt with the effect—in the <u>future</u>—of certain regulations at some unspecified site, this CWA citizen-suit necessary deals with ongoing violations—and the continuing injury those violations are causing to Plaintiffs' members—at highly specific locations.

The nature of the case presented in <u>Summers</u> dominated the Court's discussion of its reasoning.  129 S. Ct. at 1149.  Citing <u>Defenders of Wildlife</u>, the Court observed that the environmental groups faced a high hurdle to establish standing to seek judicial review of an executive action of which they were not the object.  <u>Id.</u>  Because they were unable to point to a

specific salvage timber sale to which the challenged regulations were being applied to their detriment, the environmental groups in <u>Summers</u> could not satisfy the Court that an injury to their members' interests was imminent.

In contrast, in <u>Laidlaw</u> the Court recognized that "the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms . . . is enough for injury in fact." 528 U.S. at 167. That proposition is supported in this case by the amended declarations of James Tawney (Plaintiffs' Reply Exhibit 3), Maria Gunnoe (Plaintiffs' Reply Exhibit 7), and Chuck Nelson (Plaintiffs' Reply Exhibit 8). Mr. Tawney refrains from eating fish caught from Bells Creek, downstream of Defendants' discharges into Hughes Fork of Bells Creek. Reply Ex. 3 at ¶ 12. Ms. Gunnoe no longer washes mushroom or cohosh, wades, or swims in Spruce Laurel Fork or Spruce Fork, downstream of Defendants' discharges into Trace Branch of Spruce Laurel Fork, or in West Fork of Pond Fork downstream of Defendants' discharges into James Creek of West Fork. Ex. 7 at ¶¶ 19, 20, 25, 34. Mr. Nelson no longer fishes in Spruce Fork, downstream of Defendants' discharges into Trace Branch of Spruce Laurel Fork of Spruce Fork. Ex. 8 at ¶ 14.

The cognizable injuries from Defendants' discharges into Hughes Fork of Bells Creek, Trace Branch of Spruce Laurel Fork of Spruce Fork, and James Creek of West Fork of Pond Fork stem from Plaintiffs' members' inability to conduct themselves as they would but for the Defendants' unlawful actions.[2] The imminence of the injury comes from Defendants' "continuous and pervasive illegal discharges" of selenium, not from Plaintiffs' members' imminent return to the affected area.

---

[2] This is in addition to the aesthetic injuries caused by Defendant's discharges that reduce or eliminate Plaintiffs' enjoyment of all of the streams at issue in this case. <u>See, e.g.</u>, Ps' Reply Ex. 5 at ¶ 9 (Amended Dalporto Declaration).

Following <u>Laidlaw</u>, the Fourth Circuit has rejected the notion that "conditional statements of intent are too speculative to confer standing."  <u>North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake</u>, 524 F.3d 427, 435 (4th Cir. 2008).  Similarly, the Seventh Circuit has recognized that <u>Laidlaw</u> stands for the proposition that conditional statements of intent regarding curtailed use are sufficient to establish standing in a CWA citizen suit.  <u>Sierra Club v. Franklin County Power of Illinois, LLC</u>, 546 F.3d 918, 925-26 (7th Cir. 2008) ("Moreover, if McKasson foregoes her regular visits to the lake because of these pollutants, that would also constitute an injury-in-fact.").

Nothing in <u>Summers</u> suggests that the Court intended to overrule <u>Laidlaw</u>.  Indeed, the Court cited <u>Laidlaw</u> approvingly.  <u>Summers</u>, 129 S. Ct. at 1149.  Consequently, Defendants' attempts to equate Plaintiffs' members' declarations with the "some day intentions" in <u>Defenders of Wildlife</u> must fail under <u>Laidlaw</u>.  Because Mr. Tawney, Ms. Gunnoe, and Mr. Nelson curtail their use of Bells Creek (downstream of Hughes Fork), Spruce Fork and Spruce Laurel Fork (downstream of Trace Branch), and West Fork of Pond Fork (downstream of James Creek) due to Defendants' unlawful toxic pollution, Plaintiffs have standing to prosecute Defendants for their discharges to those streams and their tributaries.

### B.  Plaintiffs' Amended Declarations Establish Their Members' Intended Future Use

Defendants take exception to Plaintiffs' members' intent to use the streams at issue in the future, suggesting that, to satisfy <u>Summers</u>, the declarants must specify a date certain that they intend to use the streams.  That is not, however, what <u>Summers</u> requires.

The <u>Summers</u> majority took issue with the environmental groups' affiant's statement that he "'want[s] to" go to the Allegheny National Forest where a series of projects may be subject to the regulations at issue in <u>Summers</u>.  129 S. Ct. at 1150.  The majority described that averment as

a "vague desire," and contrasted it with a "firm intention." Id. at 1150-51.  Intent is distinct from

desire.  The former conveys standing, the latter does not.  Tandy v. City of Wichita, 380 F.3d

1277, 1284 (10th Cir. 2004).  See also Ohio Valley Envtl. Coalition v. Aracoma Coal Co., 556

F.3d 177, 193 n.10 (4th Cir. 2009) (holding that where standing witness "travels to the . . . mine

site to take photographs of nature and she intends to do so regularly in the future," there is injury

in fact).

Plaintiffs' original and amended declarations express their members' firm intentions to

return to the affected streams.[3]  James Tawney has recreated along Bells Creek downstream of

Defendants' discharges into Hughes Fork of Bells Creek, and "will return to the area to picnic or

visit [or fish] at least three times in the next two years and intend[s] to continue [his] visits

thereafter."  Ps' Reply Ex. 3 at ¶¶ 11 & 12.  Dianne Bady has recreated along Hughes Creek,

Bullpush Fork of Smithers Creek, and Hughes Creek and "will return to Smithers Creek and

Hughes Creek downstream of Jacks Branch's discharges at least three times in the next two years

and intend[s] to continue [her] visits thereafter."  Ps' Reply Ex. 4 at ¶ 15.  Paige Dalporto has

recreated along Smithers Creek downstream of Jacks Branch's discharges and "will visit this

spot at least three times in the next two years and intend[s] to continue [his] visits thereafter."

Ps' Reply Ex. 5 at 8.  Vivian Stockman has recreated along James Creek of West Fork of Pond

Fork, Hughes Creek, Smithers Creek, and Bullpush Fork of Smithers Creek downstream of

Defendants' discharges and "will return to [these] areas at least three times in the next two years

and intend[s] to continue [her] visits thereafter."  Ps' Reply Ex. 6 at ¶¶ 14, 18, and 21.  Maria

Gunnoe has recreated along Spruce Laurel Fork (downstream of Defendants' discharges into

Trace Branch), Bull Creek of Pond Fork, and James Creek of West Fork, and "will return to

---

[3] Plaintiffs believe that the original declarations filed in this action were sufficient to establish standing, but have amended the declarations in an abundance of caution to respond to Defendants' arguments.

[these] areas at least three times in the next two years and intend[s] to continue [her] visits thereafter."  Ps' Reply Ex. 7 at ¶¶ 15, 17, & 37.  Chuck Nelson has recreated along Spruce Fork (downstream of Defendants' discharges into Trace Branch of Spruce Laurel Fork) and James Creek of West Fork of Pond Fork and "will return to [these] areas at least three times in the next two years and intend[s] to continue [his] visits thereafter."  Ps' Reply Ex. 8 at ¶¶ 12 & 20.

Plaintiffs' declarants state that they "will" visit the affected areas, not just that they "want to" go to the streams.  Moreover, Plaintiffs' declarants identify with precision where they will go, rather than referring generally to an entire national forest.  See Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv., ___ F. Supp. 2d ___, 2010 WL 2985799 at *22 (D. Mont. 2010) ("Summers has little or no application to this case because the ruling in Summers hinged on the absence of a project that could result in injury to the plaintiffs.  In this case there is a proposed action and the individual members have alleged an injury flowing from that action.").  Consequently, Plaintiffs' declarations are different in kind from the defective affidavit in Summers.

Furthermore, because they live and/or work in relative proximity to the affected areas, their statements that they will return to the impacted streams are credible.  Wilderness Soc., Inc. v. Rey, ___ F.3d ___, 2010 WL 3665713 at *4 (9th Cir. Sept. 22, 2010) ("Where the recreational use of a particular area has been extensive and in close proximity to the plaintiff, we have held that an affiant's expressed intention to continue using the land is sufficiently concrete to underwrite an injury in fact.").  The case in which the Supreme Court criticized the "some day intentions" of the plaintiffs' members involved challenges to government funded projects in Sri Lanka and Egypt.  Lujan v. Defenders of Wildlife, 55 U.S. 555, 563 (1992).  Justice Kennedy explained in his concurrence in Defenders of Wildlife that,

8

> [w]hile it may seem trivial to require [the standing witnesses] acquire airline tickets to the project sites [in Sri Lanka and Egypt] or announce a date certain upon which they will return, . . . this is not a case where it is reasonable to assume that the affiants will be using the sites on a regular basis, . . . nor do the affiants claim to have visited the sites since the projects commenced.

Id. at 575 (Kennedy, J., concurring).  The clear implication of Justice Kennedy's concurrence is that regular use could not be assumed in Defenders of Wildlife because of the exotic location of the projects at issue.  Similarly, the affiant in Summers who wanted to go to the Allegheny National Forest lived in Wood River, Illinois—at least 600 miles from the target of his desire.  In contrast, Plaintiffs' declarants live and work in the vicinity of the streams receiving Defendants' toxic pollution, their assertions of future use are credible, and a "credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person."  Ecological Rights Found. v. Pacific Lumber Co., 230 F.3d 1141, 1149 (9th Cir. 2000).

This Court has cited the Ninth Circuit's Ecological Rights Foundation decision approvingly.  Ohio Valley Envtl. Coalition v. Apogee Coal Co., LLC, Civ. No. 3:07-cv-413, Doc. # 67 at 6 (S.D. W. Va. May 2, 2008) (citing Ecological Rights Foundation for the proposition that "there is no formula requiring some minimum frequency or repetitive use of the area.").  Regarding proximity, the Ninth Circuit explained that "a person who lives quite nearby is likely to notice and care about the physical beauty of an area he passes often."  Ecological Rights Found., 230 F.3d at 1149.  Under that reasoning, the proximity of Plaintiffs' declarants to the affected areas renders their allegations of future use credible.  Because their declarations of future use are credible, there is no need to require that Plaintiffs' declarants "announce a date certain" that they will return to the affected streams.  Defenders of Wildlife, 555 U.S. at 575 (Kennedy, J., concurring).  See also Stevens v. Premier Cruises, Inc., 215 F.3d 1237, 1239 (11th

Cir. 2000) (holding that, in an Americans With Disabilities Act ("ADA") claim, an amended complaint that alleged an intent to visit the noncompliance facility in the "near future" would be sufficient to state a claim, even though the amended complaint lacked a date certain); Norkunas v. Seahorse NB, LLC, ___ F. Supp. 2d ___, 2010 WL 2431874 at *5 (M.D. Fla. June 16, 2010) ("[S]tanding should not be denied to a plaintiff seeking relief under the ADA merely because he cannot produce evidence of a specific date and time to return.").   Plaintiffs' declarants' statements that they "will return" a number of times in the next two years are sufficient to establish standing.

        That proposition is supported by numerous cases decided after Summers.  See, e.g., The Wilderness Society v. Kane, 581 F.3d 1198, 1210-1211 (10th Cir. 2009) (holding declarations of plans for future use within the year sufficient to establish imminent injury); Forest Service Employees for Environmental Ethics v. U.S. Forest Serv., 2010 WL 2985799 at *21 (standing established by repeated use and an intent to continue use on multiple occasions in next year); Forest Service Employees for Environmental Ethics v. U.S. Forest Serv., 689 F. Supp. 2d 891, 896 (W.D. Ky. 2010) (declaration of plans to visit in the coming year held sufficient to establish standing).  Accordingly, Plaintiffs' amended declarations are sufficient to establish standing as a matter of law.

## III.    There is No Issue of Material Fact Regarding the Nature of the Streams that Receive Defendants' Selenium Discharges

        Defendants insist that Plaintiffs motion for partial summary judgment should be denied because "there exists a question of material fact as to whether Defendants are discharging selenium into 'navigable waters' under the NPDES Permits that are the subject of this Motion." Ds' Memo. at 11.  That argument is baseless for two reasons.  First, because this is an action to enforce the terms and conditions of Defendants' NPDES permits, Plaintiffs have no obligation to

establish that the receiving streams are waters of the United States.  Second, even if there were

such an obligation, the NPDES permits themselves are conclusive proof that the receiving

streams are navigable waters, and Defendants cannot now collaterally attack those permits.

Moreover, even if the NPDES permits were not conclusive proof, six of the seven streams at

issue are on West Virginia's list of impaired streams, submitted by EPA, which is evidence that

they are waters of the United States.

### A. Whether Receiving Streams are "Navigable" is Not an Element of a Suit to Enforce a Permit

Defendants have confused the elements required in an "unpermitted discharge" case with

the elements of a permit enforcement action and insist that the former apply in the latter.  Section

301(a) of the Clean Water Act prohibits the discharge of pollutants into navigable waters (i.e.,

waters of the United States) without a permit.  33 U.S.C. § 1311(a).  To establish liability for a

violation of Section 301, the government or a citizen plaintiff "must prove that (1) a person (2)

discharged a pollutant (3) from a point source (4) into waters of the United States (5) without a

permit."  U.S. v. Cundiff, 555 F.3d 200, 213 (6th Cir. 2009); W. Va. Highlands Conservancy v.

Huffman, 651 F. Supp. 2d 512, 518 (S.D. W. Va. 2009).  In this case, however, Plaintiffs do not

allege that Defendants have committed unpermitted discharges.  Rather, Plaintiffs assert that

Defendants are violating the terms of their NPDES permits.

Under the Clean Water Act's citizen suit provision, citizen plaintiffs can bring actions in

federal court against persons alleged to be in violation of, among other things, "an effluent

standard or limitation."  33 U.S.C. § 1365(a)(1).  The provision also defines the term "effluent

standard or limitation" to include, among other things, either an unpermitted discharge under

Section 301 of the Act or an NPDES "permit or condition thereof."  33 U.S.C. § 1365(f)(1), (6).

Plaintiffs' Clean Water Act claims arise under Section 505(f)(6), rather than Section 505(f)(1).

To prosecute a violation of a NPDES permit under Section 505(f)(6), a citizen-plaintiff need show only that a permit issued under Section 402 of the CWA Act (or a condition thereof) was violated, not that a discharge occurred into a water of the United States.  Section 402 of the CWA codifies the "national pollution discharge elimination system," or NPDES.  33 U.S.C. § 1342.  Defendants do not dispute that they hold the WV/NPDES permits.  Accordingly, this is an action to enforce a permit issued under Section 402 of the CWA.  See 47 C.S.R. § 30-3.1.a.7 ("A WV/NPDES permit issued pursuant to Section 3 of this rule shall be deemed to be a permit issued in accordance with Article 11 and the CWA.").

Consequently, in a case like this "all the court . . . is called upon to do is compare the allowable quantities listed in the permits with the available statistics on actual pollution." Student Pub. Interest Res. Gp. of N.J. v. Monsanto, 600 F. Supp. 1479, 1483 (D.N.J. 1985), cited in Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC, ___ F. Supp. 2d ___, ___, 2010 WL 2739990 at *2 (S.D. W. Va. 2010).  As the Supreme Court of the United States has observed, "the principal means of enforcing the pollution control and abatement provisions of the Amendments is to enforce compliance with a permit."  EPA v. Calif. ex rel. State Water Res. Control Bd., 426 U.S. 200, 223 (1976).  Indeed, "[a]n NPDES permit serves to transform generally applicable effluent limitations and other standards . . . into obligations (including a time table for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits."  Id. at 205.  Accordingly, in an action to judicially enforce the terms of a permit, there is no need to establish that the receiving stream is a water of the United States.  Here, all that Plaintiffs must do is establish that Defendants are violating the terms and conditions of their permits.  Plaintiffs have done that.

///

**B. Even if Plaintiffs Were Required to Establish that a Receiving Stream is a Navigable Water, That Issue is Conclusively Resolved by the Issuance of Defendants' WV/NPDES Permits, and Defendants Cannot Collaterally Attack Those Permits**

Even if evidence that a permit violation results from a discharge into a navigable water were required in a case like this, the existence of the permit itself should be considered conclusive evidence on that issue.  In support of their motion for partial summary judgment, Plaintiffs submitted the relevant WV/NPDES Permits to the Court.  The issuance of a WV/NPDES permit is, by operation of law, a "permit issued in accordance with . . . the CWA." 47 C.S.R. § 30-3.1.a.7.  To be a "national pollution discharge elimination system" permit, it must eliminate national pollution, i.e., it must be a federal permit.  If it is a federal permit, then it necessarily regulates discharges into waters of the United States.  Such a finding is implicit in the issuance of every NPDES permit.

Defendants do not dispute that they hold the relevant permits or that those permits regulate their discharges into the streams at issue.  Rather, Defendants essentially collaterally attack the validity of those permits by asserting that further proof is needed that their selenium discharges are into waters of the United States.  If Defendants believed that their mines did not discharge into waters of the United States, however, Defendants could have challenged the need for a Clean Water Act permit to regulate their discharges.  There is no evidence that Defendants did so.  It is well-settled that, having accepted federal jurisdiction over their mines, Defendants cannot challenge that jurisdiction now in this suit.  See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 14 (1981) (holding that "where review could have been obtained" under 33 U.S.C. § 1369(b), NPDES permits "may not be challenged in any subsequent civil or criminal proceeding for enforcement"); U.S. v. Hartsell, 127 F.3d 343, 351 (4th Cir. 1997) (holding that permit terms cannot be contested in an enforcement action); Public

13

Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 78

(3rd Cir. 1990) ("Because PDT never challenged the BOD and TSS limits in its permit until

PIRG brought this enforcement action, it may not challenge them now."); U.S. v. Gulf States

Steel, Inc., 54 F. Supp. 2d 1233, 1244 (N.D. Ala. 1999); Friends of the Earth v. Laidlaw Envtl.

Serv., 956 F. Supp. 588 , 597-98 (D.S.C. 1997); Connecticut Fund for the Envt. v. Job Planning

Co., Inc., 623 F. Supp. 207, 216-18 (D. Conn. 1985).

Indeed, in United States v. St. Bernard Parish, the Court explicitly held that the

defendant's failure to challenge its NPDES permit barred it from arguing that the water into

which it was discharging was not a water of the United States.  United States v. St. Bernard

Parish, 589 F. Supp. 617, 619 (E.D. La. 1984) (citing 33 U.S.C. § 1369(b)(1)).  The United

States District Court of the District of New Jersey has reached the same conclusion.  Faced with

an argument similar to Defendants', that court stated

> Plaintiffs also assert that the Act provides that NPDES permits are required by
> those who discharge pollutants into navigable waters.  Plaintiffs claim that the
> fact that defendants applied for and were issued a NPDES permit is "conclusive
> proof that defendant discharges pollutants" into "navigable waters."  Plaintiffs are
> correct that had defendant believed that the Creek was not a navigable water, it
> could have challenged its permit and would have been afforded administrative
> review, including a hearing on the record. 40 C.F.R. § 124.71-124.128.
> However, Defendant failed to challenge its permit and clearly cannot raise the
> invalidity on the navigable waters issue.

Student Public Interest Research Group of New Jersey v. Anchor Thread Co., No. 84-320, 22

E.R.C. 1150, 1153 (D.N.J. Oct. 1, 1984) (attached as Ps' Reply Ex. 9).  Defendants do not cite

any authority to the contrary.

In short, to the extent such proof is necessary, the existence of WV/NPDES permits

regulating Defendants' discharges into the streams at issue should be conclusive proof that the

streams that receive Defendants' unlawful selenium discharges are waters of the United States.

Defendants have not asserted that they have appealed those permits under State law, as permitted under W. Va. Code § 22-11-21.  Consequently, if Plaintiffs were required to establish that Defendants' selenium discharges are into waters of the United States, they could do so via Defendants' WV/NPDES permits.

### C.  Six of the Seven Streams at Issue Have Been Identified as Navigable Waters by WVDEP and EPA

Alternatively, if Plaintiffs were required to establish that the receiving streams are navigable waters, and the existence of Defendants' WV/NPDES permits were insufficient to do so, Plaintiffs could meet that requirement for six of the seven streams at issue by reference to West Virginia's "305(b) report."  Section 305(b) of the CWA requires the State to submit to EPA reports describing the quality of "all navigable waters in such State."  33 U.S.C. § 1315(b).  West Virginia's 2008 305(b) report identifies six of the seven streams at issue in this case (James Creek, Bull Creek, Bullpush Fork, Sixmile Hollow, Hughes Fork of Bells Fork, and Hughes Creek) as impaired for one pollutant or another.  See Ps' Reply Exhibit 10 (excerpts of 2008 West Virginia Integrated Water Quality Monitoring and Assessment Report).  Inclusion in the State's 305(b) report has been deemed sufficient to establish that a receiving stream is a navigable water for purposes of a citizen enforcement action.  Anchor Thread, 22 ERC at 1153.

### IV.  The Selenium Limits in Defendants' WV/NPDES Permits Are Currently In Effect, and Defendants are in Violation of those Limits and the Amended Orders

Defendants applied to WVDEP for modifications to the final deadline for compliance with the selenium limits in their WV/NPDES permits, but WVDEP denied those modification requests because Defendants had not made sufficient efforts to come into compliance during the preceeding three years.  Exs. 4, 8, & 12 to Ps' Motion for Partial Summary Judgment (Doc. Nos. 15-4, 15-8, & 16-4).  Defendants appealed those denials to the West Virginia Environmental

Quality Board ("EQB"), and purport to have obtained "stays" of the final effective dates of their selenium limits.  Ds' Exs. 1-4.  Relying on those "stays,"  Defendants assert that their selenium limits are not in effect and that the Court should, therefore, grant summary judgment in their favor.  Defendants are wrong.

### A. The Enforceability of Defendants' Selenium Limits Is a Question of Federal, Not State, Law

West Virginia's NPDES program, and its authority to issue NPDES permits, did not become effective until it was approved by the U.S. Environmental Protection Agency under section 402 of the CWA.  33 U.S.C. § 1342(b) (authorizing a state to "administer its own permit program" after EPA approval).  Upon approval of a state's primacy to operate a NPDES program, EPA "shall suspend the issuance of permits."  33 U.S.C. § 1342(c)(1).  However, only the federal permitting program is suspended, not the CWA's other provisions.  Washington Wilderness Coalition v. Hecla Min. Co., 870 F. Supp. 983, 987 (E.D. Wash. 1994) ("Section 1342(c) . . . simply guarantees that the state will be the sole entity issuing NPDES permits.").

EPA approved West Virginia's NPDES program in 1982.  Section 402(c)(2) clearly provides that, after a state assumes primacy for the CWA permit program, its program "shall at all times be in accordance with this section."  33 U.S.C. § 1342(c)(2) (emphasis added).  "All times" means both before and after EPA delegation.  Thus, "[t]he federal NPDES program allows a state to take control of the permitting process within its borders, so long as it complies with the federal standards set forth by the Clean Water Act and the regulations promulgated under that act."  Ohio Valley Envtl. Coalition v. Miano, 66 F. Supp. 2d 805, 807 (S.D. W. Va. 1998).  "To maintain primacy over the permitting process, the State must comply with all applicable federal laws."  Id.  Consequently, the federal law under the CWA continues to apply to state programs even after EPA's federal permit program is suspended.

This conclusion is supported by the fact that EPA's NPDES permitting requirements expressly apply to state NPDES permit programs.  40 C.F.R. § 123.25(a).  State programs "must be administered in conformance with" these requirements.  Id.  One of those federal requirements is that a permit cannot be modified by a state unless the state follows federal procedures for public notice and comment.  Id. § 123.25(22) (incorporating 40 C.F.R. § 122.62 concerning permit modifications).  Another federal requirement is that a permit cannot be "modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard."  Id. § 123.25(15) (incorporating 40 C.F.R. § 122.44(l)(2)(ii) concerning anti-backsliding).

After EPA approval, therefore, the enforceability of a state-issued NPDES permit is a matter of federal, not state, law.  A state's compliance with federally-mandated requirements in federal regulations raises an issue of federal law.  Arkansas v. Oklahoma, 503 U.S. at 110 (federal CWA regulation incorporating by reference state water quality standards makes those standards federal law).  That conclusion is also compelled by the Fourth Circuit's decision in Antrican v. Odom, 290 F.3d 178, 187 (4th Cir. 2002), where the court allowed a suit against state officials to enforce the federal Medicaid Act because "it requires States to have their plans approved by the supervising federal agency and to adhere to strict federal guidelines."  There, as here, federal standards "remain the directly applicable standards with which the States must comply . . . ."  Id.  Thus, the CWA remains the applicable federal law in primacy states.

After state delegation, citizens may enforce state-issued NPDES permits in federal court under the citizen suit provision of the CWA.  Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1005-08 (11th Cir. 2004).  Section 505 gives citizens the authority to commence civil actions in federal district court "against any person" who is alleged to be in violation of an

"effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  An "effluent standard or limitation" is specifically defined in section 505(f)(6) to mean "a permit or condition thereof issued under section 402" by a delegated state like West Virginia.  33 U.S.C. § 1365(f)(6).  The enforceability of a permit condition in such a permit, including the selenium limits in this case, is a question of federal law.

### B. The EQB Orders Did Not Effectively Stay Defendants' Selenium Limits Because the Orders Did Not Comply With Two Federal Requirements for Permit Modifications

Defendants argue that the EQB Orders stayed and indefinitely suspended the April 5, 2010 effective date of the selenium limits in their WV/NPDES permits.  Even if the EQB acted within the scope of its authority, however, its effort was not effective to suspend Defendants' selenium limits for at least two reasons.  First, the EQB did not follow the permit modification procedures required by federal and state law.  Second, such a suspension would violate the anti-backsliding provisions of the CWA.

### 1. Because the EQB Did Not Follow Required Procedures, Its Orders Were Ineffective to Suspend Defendants' Selenium Limits

As a matter of federal law, the EQB orders were ineffective to modify Defendants' selenium limits.  A state-issued NPDES permit may only be modified in compliance with federal procedures.  Judge Copenhaver recently summarized those procedures in Sierra Club v. Powellton Coal Co., LLC, 2010 WL 454929 at *16 (S.D. W. Va. 2010):

> Federal and state regulations provide the proper procedures for issuing permit modifications. There are two types of permit modification: minor and major. 40 C.F.R. §§ 122.62, 122.63; W. Va. Code R. § 47-30-8.2.  Minor modifications do not require public notice for certain small changes to permits, such as correcting typographical errors. 40 C.F.R. § 122.63; W. Va. Code R. § 47-30-8.2.c.1.  None of the modifications issued by the WVDEP for WV/NPDES Permits WV1019279 and WV1019449 fall within the enumerated list of permissible minor modifications, so they must be considered major.

> Federal and state law specifically categorize as major modifications those that are based on

18

new rules and those that change compliance schedules. 40 C.F.R. § 122.62; W. Va. Code R. § 47-30-8.2.c.2.C-D. Major modifications require preparation of a draft permit and compliance with public notice procedures. 40 C.F.R. § 122.62; W. Va. Code R. § 47-30-8.2.c.2. In order to be valid, there must be notice advising the public that a draft permit has been prepared and providing a minimum 30 day period for public comment. Id. If the modification orders do not comply with the requisite procedures, they are defective and citizen suits may proceed based on the terms of an original permit. Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC, 531 F.Supp.2d 747, 754 (S.D. W. Va. 2008). See also Proffitt v. Rohm & Haas, 850 F.2d 1007 (3d Cir. 1988); Citizens for a Better Env't-CA v. Union Oil Co. of CA, 83 F.3d 1111 (9th Cir. 1996).

Judge Copenhaver concluded that "plaintiffs may establish continuing aluminum violations in accordance with the aluminum compliance schedules within the original permits."  Id.  In the Apogee case cited by Judge Copenhaver, this Court similarly concluded that "a citizen suit may proceed on the terms of an original permit if an attempt to modify does not comply with the necessary procedures."  531 F. Supp. 2d at 754.[4]  Both the Powellton and the Apogee cases followed an unbroken line of federal appellate cases, including Fourth Circuit precedent:  United States v. Smithfield Foods, Inc., 191 F.3d 516, 524, 526 (4th Cir. 1999).

As in the Powellton and Apogee cases, the EQB did not follow the required federal procedures for modifying an NPDES permit when it issued the orders on which Defendants rely. It did not prepare a draft permit, provide public notice of such a draft, or provide any opportunity for public comment.  Instead, it unilaterally granted Defendants' motion for a stay without any public participation.  Indeed, there is no mechanism for the provision of public notice when polluters, such as Defendants, appeal the denial of a permit modification.  Moreover, because WVDEP denied Defendants' modification application, there has never been any public notice of Defendants' proposed modification.  The attempted modification therefore violated federal law

---

[4] It makes no difference that the EQB, instead of WVDEP, attempted to modify Defendants' permit.  The EQB is a state administrative body and subject to the supremacy of federal law.  Alternatively, even if the EQB were acting in a quasi-judicial capacity, rather than playing a purely administrative role, that would make no difference.  See Frilling v. Village of Anna, 924 F. Supp. 821, 844 n.27 (S.D. Ohio 1996) (holding that judicial order imposing interim limits did not modify underlying permit, noting that fact that consent order was judicially approved is not "significant").

and was ineffective.  <u>Powellton</u>, 2010 WL 454929, at *16; <u>Apogee</u>, 531 F. Supp. 2d at 754.

### 2. The EQB's Orders Cannot Suspend Defendants' Selenium Limits Because Such a Suspension Would Violate Federal Law

In addition, the EQB's orders were ineffective because they relaxed existing permit conditions, in violation of the federal anti-backsliding provision.  33 U.S.C. § 1342(o); 40 C.F.R. § 122.44(l)(2)(i).  That provision prohibits "with certain narrow exceptions, any modified permit from containing 'effluent limitations which are less stringent than the comparable effluent limitations in the previous permit.'"  <u>Citizens for a Better Environment v. Union Oil Co.</u>, 83 F.3d at 1120.  <u>See also</u> <u>PIRG v. New Jersey Expressway Authority</u>, 822 F. Supp. 174, 185 (D.N.J. 1992) (relaxation of permit provisions in state agreement would conflict with the anti-backsliding provision).  The Clean Water Act defines the term "effluent limitation" to include schedules of compliance.  33 U.S.C. § 1362(11).  Hence, the anti-backsliding prohibition applies equally to the normal type of discharge limits and to compliance schedules.  Neither one can be made less stringent.

The EQB orders purport to extend the final deadline in the selenium schedule of compliance indefinitely.  In the preamble to the final rules on permit modification, a document in which EPA showed great concern for preventing backsliding, EPA explained that "[a]n extension of the final compliance date clearly renders the permit less stringent."  44 Fed. Reg. 32,870.  In short, because the EQB orders render the existing effluent limitation (in the form of a compliance schedule) less stringent by extending the final compliance date, they run afoul of the anti-backsliding provisions of the Clean Water Act.  Consequently, the EQB's orders violate the anti-backsliding prohibition.

### C. Alternatively, the EQB's "Stays" Are Not  Stays Because the EQB Cannot Use a "Stay" to Substantively Alter NPDES Permit Limits

As a matter of federal law, the EQB's failure to follow federal requirements nullifies its

attempt to modify or suspend Defendants' selenium limits.  There is therefore no need to

consider the effect of the EQB's action under state law.  Under the Supremacy Clause of the U.S.

Constitution, federal law trumps state law.  However, even assuming <u>arguendo</u> that state law is

relevant, EQB's actions fail on that alternative basis as well.

Defendants argue that there are no ongoing violations of the selenium limits in the

WV/NPDES permits at issue because the EQB has stayed WVDEP's denial of Defendants'

request to modify those limits.  Defendants are correct that the EQB order purports to suspend

the permit limits for selenium.  Defendants, however, are mistaken about the meaning of "stay"

and the scope of W. Va. Code § 22B-1-7(d).  The EQB does not have the authority under state

law, statutory or otherwise, to affirmatively delay the effective date of Defendants' selenium

limits.  Those limits became effective on April 5, 2010, under the terms of compliance orders

issued in 2007 that were ultimately upheld by the EQB.  The EQB's orders cannot be squared

with settled case law defining "stay," nor with the language of W. Va. Code § 22B-1-7(d).

Therefore, Defendants' selenium limits became effective on April 5, 2010, as scheduled, and

Defendants are in continuing violation of the Permit.

As a threshold matter, the EQB is an administrative agency created by statute, and the

Legislature defines its authority through statute.  <u>State ex rel. Hoover v. Berger</u>, 199 W. Va. 12,

483 S.E.2d 12 (1996).  The statute does not grant equitable powers to the EQB. Consequently,

the EQB does not have inherent equitable authority like that possessed by state or federal courts.

<u>See</u> <u>International Union of Elec., Radio and Mach. Workers, AFL-CIO v. N. L. R. B.</u>, 502 F.2d

349, 354 n.* (D.C. Cir. 1974).  Accordingly, to the extent the EQB's orders are grounded in

principles of common law equity, they are <u>ultra vires.</u>

Moreover, the EQB's orders go beyond its statutory authority.  A stay is not a substantive

21

ruling.  A stay does nothing more than preserve the status quo pending appeal.  W. Va. Code § 22B-1-7(d)—the only source of the EQB's pre-decision authority—employs this well-settled meaning of the term.  The meaning is evident from the statute itself.  W. Va. Code § 22B-1-7(d) provides:

> If it appears to the appropriate chief, the secretary or the board that an unjust hardship to the appellant will result from the execution or implementation of a chief's or secretary's order, permit or official action pending determination of the appeal, the appropriate chief, the secretary or the board, as the case may be, may grant a stay or suspension of the order, permit or official action and fix its terms …

The referenced "order, permit or official action" refers back to the first sentence of the subsection, which provides that "[t]he filing of the notice of appeal does not stay or suspend the effectiveness or execution of the order, permit or official action appealed from …."  W. Va. Code § 22B-1-7(d) (emphasis added).  Thus, the only "order, permit, or official action" that can be stayed through the authority granted in § 22B-1-7(d) is the order, permit, or action "appealed from"—here, the denial of Defendants' requests for permit modifications.  A denial is the decision not to modify the permit.  Accordingly, a stay pursuant to W. Va. Code § 22B-1-7(d) can only suspend that decision not to modify pending appeal.  Like any other stay, the EQB's actions under W. Va. Code § 22B-1-7(d) merely "holds off" the ruling being appealed, thereby leaving in place the status quo ante:  selenium limits effective April 5, 2010.  Accordingly, when the EQB purported to "STAY[] those parts of [Defendants'] respective permits and/or compliance schedules that would otherwise impose final selenium effluent limits beginning in April or May, 2010 until further order or final order of this Board," it exceeded its authority.  Ds' Exs. 3 & 4.

      To interpret W. Va. Code § 22B-1-7(d) otherwise would be to misconstrue the meaning of "stay."  The Supreme Court of the United States has recently thoroughly defined "stay":  "A

stay does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it." Nken v. Holder, __ U.S. __, 129 S.Ct. 1749, 1753 (2009) (examining at length the definition of "stay" in the context of traditional court powers and the Immigration and Nationality Act).  See also Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 9, 62 S.Ct. 875 (1942); BLACK'S LAW DICTIONARY 1413 (6th ed. 1990) (cited approvingly by the Nken Court).  A stay operates "by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct.  A stay simply suspend[s] judicial alteration of the status quo …." Nken, 129 S.Ct at 1758 (internal quotations omitted.) "The whole idea [of a stay] is to hold the matter under review in abeyance because the appellate court lacks sufficient time to decide the merits."  Id. at 1760.  See also BLACK'S LAW DICTIONARY, stay (8th ed. 2004) (defining "stay" as "[a]n order to suspend all or part of a judicial proceeding or a judgment resulting from that proceeding. — Also termed *stay of execution*; *suspension of judgment*") (emphasis added.)

Thus, a stay is merely a decision to maintain the status quo pending appeal.  The Nken Court's definition is not an innovation; it is echoed in federal courts across the country as well as in the courts of West Virginia.  See, e.g., In re Zapata Gulf Marine Corp., 941 F.2d 293, 295 (5th Cir. 1991) (interpreting Fed. R. Civ. P. 62(d) and noting that its reference to "stay" only refers to a stay of the particular appeal that is pending, not any prior, underlying judgments); Gilley v. U.S., 649 F.2d 449, 453 (6th Cir. 1981) ("stays are granted by a reviewing court in order to maintain the status quo pending its own review of the actions in question"); Lincoln Elec. Co. v. MPM Technologies, Inc., 2009 WL 3246936, *1 (N.D. Ohio 2009);  West Virginia Dep't of Health v. West Virginia Civil Service Com'n, 178 W.Va. 237, 238, 358 S.E.2d 798, 799 (1987) (noting that the stay at issue preserves the status quo pending appeal); Johnson v. Johnson, 159

W.Va. 434, 436, 223 S.E.2d 195, 197 (1976) (holding that the stay at issue preserves the status quo).

Here, the status quo and the effect of the denial are the same: the terms of Defendants' WV/NPDES permits stand as issued.  However, the EQB, through its "stay," purports not only to suspend the denial, but to affirmatively suspend Defendants' selenium limits going forward.  Its "stays" would have the effect of a de facto permit modification:  a substantive ruling, not a suspension of the action "appealed from" pending appeal.[5]

The EQB's opinions demonstrate that it purports to do much more than suspend the effect of WVDEP's denials.  The EQB asserted that its orders "STAY[] those parts of [Defendants'] respective permits and/or compliance schedules that would otherwise impose final selenium effluent limits . . . until further order or final order of this Board."  D's Ex. 3 and 4.  Far more than holding WVDEP's denial in abeyance pending appeal, the EQB's orders purports to create new substantive law.  Therefore, the orders do not constitute a "stay" under any accepted definition of the term, nor under the plain language of W. Va. Code § 22B-1-7(d).

WVDEP issued compliance schedules setting April 5, 2010, as Defendants' compliance deadline on April 5, 2007.  Those schedules were affirmed by the EQB, and a stay of a denial to modify a schedule cannot itself alter a schedule.[6]  As explained above, permit modifications

---

[5] A hypothetical makes clear that the EQB's stay of a denial cannot result in affirmative relief.  Suppose a new discharger's application for an NPDES permit to discharge pollutants were denied by WVDEP.  A stay of that denial could not possibly result in the authorization for the applicant to discharge pollutants during the pendency of the applicant's appeal of the denial to the EQB.

[6] Moreover, the EQB's orders are predicated upon the finding of an "unjust hardship to the appellant" as provided in W. Va. Code § 22B-1-7(d).  However, the "unjust hardship" must result from the agency's or the board's action that is being appealed:  "If it appears to the . . . board that an unjust hardship will result from the execution or implementation of a chief's or secretary's order, permit or official action pending determination of the appeal" then a stay of the action may be granted.  W. Va. Code § 22B-1-7(d).

Any hardship found by the Board does not result from the agency's or the Board's denial.  Rather, the effective selenium limits stem from a previous, and no longer appealable, action.  Accordingly, the threshold set by W. Va. Code § 22B-1-7(d) has not been satisfied, and the purported suspension of the selenium limits is of no effect.

must be accompanied by public notice and comment.  Defendants cannot rely on the EQB's

exceedance of its authority to achieve that which WVDEP denied.  As a result, Defendants

cannot rely on the EQB's orders to avoid liability in this action.

### D.  Defendants Are in Violation of the Construction Deadlines in the Amended Orders, and Those Deadlines Are Enforceable in This Action

Defendants only effort to address Plaintiffs claims related to the Amended Orders that

imposed deadlines for the construction of selenium treatments systems falls short.  In footnote

five of their response brief, Defendants state

> The Amended Orders that Plaintiffs allege Defendants are in violation of impose
> identical deadlines for compliance with the selenium limits in the relevant
> Permits.  Section 505(a)(1) of the Clean Water Act allows citizen suits to proceed
> if they address violations of an "order issued by the Administrator or a State with
> respect to [effluent] standard[s] or limitation[s]."  The Amended Orders at issue
> ultimately required Defendants to "[c]omplete installation or construction of the
> treatment facilities, and <u>achieve compliance with the final effluent limitations</u>" by
> April 5, 2010.  <u>See</u> Pltfs' Mot. for Partial Summary Judgment at Exs. 3, 7, and 11.
> Therefore, the Amended Orders were issued by WVDEP "with respect to
> [effluent] standard[s] or limitation[s] for purposes of Section 505(a)(1) of the
> CWA only to the extent that the Amended orders required compliance with
> selenium limits by April 5, 2010.  However, because the compliance deadlines set
> forth in the Amended Orders are congruent with the selenium limits that have
> been stayed by the EQB, Defendants are not currently "in violation" of the
> Amended Orders within the scope of the Clean Water Act.

Ds' Memo. at 12 n.5 (emphasis and modifications in original).  Defendants expressly assert that,

because their selenium limits are stayed, they are not in violation of the Amended Orders.  That

assertion is refuted by the argument presented above:  the EQB orders cannot be given the effect

of modifying the effective date of Defendants' selenium limitations.  Therefore, the provisions of

the Amended Orders requiring compliance by April 5, 2010, also remain in force.

Implicit in Defendants' footnote 5 is the argument that the construction deadlines in the

Amended Orders are not enforceable because they were not set "with respect to [effluent]

standard[s] or limitation[s]."  That argument is also easily refuted.

Defendant cites Section 505(a)(1) of the CWA and asserts that the Amended Orders are enforceable "only to the extent that the Amended orders required compliance with selenium limits by April 5, 2010."  Ds' Memo. at 12 n.5.  The implication is that, because (as Defendants see it) the construction deadlines were not set "with respect to [effluent] standard[s] or limitation[s]," they are not enforceable.

Defendants appear to narrowly define "effluent standard or limitation" to refer to numeric limits only.  Even under that narrow construction, however, the construction deadlines were set with respect to Defendants' numeric selenium limits:  the deadlines were set to enable Defendants to comply with those limits.

Importantly, however, even if the construction deadlines were not set with respect to the numeric limits, they were still set with respect to an "effluent standard or limitation" as that term is defined in the CWA.  Defendants too narrowly define the term "effluent standard or limitation."  Section 505(f) defines that term to include "a permit . . . issued under section 1342 of this title."  33 U.S.C. § 1365(f)(6).  In other words, the enforcement of state issued orders is possible through a citizen suit so long as the order was issued with respect to an NPDES permit.

Enforcement of the Amended Orders is not, therefore, limited to those provisions directly related to the selenium limitations.  The Amended Orders were issued with respect to Defendants' WV/NPDES permits as a whole.  See, e.g., Ex. 7 to Ps' Motion for Summary Judgment (indicating that the order was issued "Re:WV/NPDES Permit No. WV1017152").  Because an "effluent limitation or standard" includes an NPDES permit under Section 505(f)(6), the Amended Orders were issued with respect to an effluent limitation or standard in their entirety.  Consequently, every obligation in the Amended Orders relates to the permit as a whole and is enforceable—including the construction deadlines.  Because Defendants have not

constructed selenium treatment facilities, and the time for the completion of those systems has

passed, Defendants are in violation of the Amended Orders.  Because the construction deadlines

are not subject to any purported stays, Defendants have offered no defense as to their violations

of those deadlines.  Accordingly, the Court should grant Plaintiffs' motion for summary

judgment on their claims related to the Amended Orders and deny Defendants' cross-motion.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Partial Summary

Judgment and deny Defendants' Cross-Motion for Partial Summary Judgment.

Respectfully submitted,

**/s/ Derek O. Teaney**
DEREK O. TEANEY (WVSB # 10223)
JOSEPH M. LOVETT (WVSB # 6926)
Appalachian Ctr. for the Econ. & the Envt.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax: (304) 645-9008
E-mail: dteaney@appalachian-center.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

**OHIO VALLEY ENVIRONMENTAL
COALITION, INC., et al.,**

        **Plaintiffs,**

        **v.**                              **CIVIL ACTION NO. 3:10-cv-836**

**INDEPENDENCE COAL COMPANY, INC. et al.,**

        **Defendants.**

**CERTIFICATE OF SERVICE**

        I, Derek O. Teaney, do hereby certify that, on October 18, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Robert G. McLusky
Jackson Kelly PLLC
500 Lee Street East
Suite 1600
PO Box 553
Charleston, WV 25322
*Counsel for Defendant*

                                     **/s/ Derek O. Teaney**_____
                                     DEREK O. TEANEY (WVSB # 10223)
                                     Appalachian Ctr. for the Econ. & the Envt.
                                     P.O. Box 507
                                     Lewisburg, WV 24901
                                     Telephone: (304) 793-9007
                                     Fax: (304) 645-9008
                                     E-mail: dteaney@appalachian-center.org

                                     *Counsel for Plaintiffs*