**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**OHIO VALLEY ENVIRONMENTAL COALITION, INC., WEST VIRGINIA HIGHLANDS CONSERVANCY, INC., COAL RIVER MOUNTAIN WATCH, INC., and SIERRA CLUB**

**Plaintiffs,**

**v.** **CIVIL ACTION NO. 3:10-cv-0836**

**INDEPENDENCE COAL COMPANY, INC., and JACKS BRANCH COAL COMPANY,**

**Defendants.**

**PROPOSED INTEGRATED PRETRIAL ORDER**

Pursuant to the Court's May 3, 2011 Scheduling Order and Local Rule 16.7(b), Defendants submit this Proposed Pretrial Order.

**(1) Pre-Trial Disclosures Required by FR Civ P 26(a)(3) and Objections Thereto**

Under the Court's May 3, 2011 Scheduling Order, the parties will exchange FRCP 26(a)(3) disclosures on May 31, 2011.

**(2) Contested Issues of Law Requiring a Ruling Before Trial**

The following questions of law will be presented by Defendants' motion in limine and petition for certificate of finality for appeal (Doc. 105) and will be ripe for a ruling before trial:

a. Whether Dr. Kavanaugh's testimony regarding Defendants' economic benefit should be excluded.

b. Whether the case should be held in abeyance pending appeal.

**(3) Statement of Elements of Plaintiffs' Claims**

In its March 31, 2011 Order, this Court granted Plaintiffs' Motion for Partial Summary Judgment and for Permanent and Injunctive Relief. Doc. # 70. Specifically, the Court

> **GRANTED** summary judgment on [Plaintiffs'] First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eight, and Ninth Claims for relief . . . except insofar as those claims address Outfall 023 of Indepedence[ Coal Company's] WV1017152 permit, Outfall 014 of Jacks Brach[ Coal Company's] WV0093912 permit, and Outfall 004 of Independence's WV1016890 permit . . . .

Id. at 48. Plaintiffs did not move for summary judgment on those three outfalls because, at the time they filed their motion for summary judgment, there had not been post-complaint violations at those outfalls. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, 484 U.S. 49 (1987). Plaintiffs no longer plan to pursue any claims related to Outfall 004 of Independence's Permit WV1016890 or related to Outfall 023 if Independence's Permit WV1017152. Plaintiffs can, however, establish post-complaint violations of the selenium limits on Outfall 014 regulated by Jacks Branch's Permit WV0093912. Discharge monitoring reports from the Fourth Quarter of 2010 and First Quarter of 2011 establish those violations. The Court's March 31, 2011 determination that Plaintiffs have standing to prosecute violations in Hughes Creek from Outfalls 22, 33, and 34, governs the question of whether Plaintiffs have standing to prosecute violations from Outfall 014 because it also discharges to Hughes Creek. Doc. # 70 at 13.

To prevail on their claims related to Outfall 014 of WV/NPDES Permit WV0093912, Plaintiffs will have to establish that Jacks Branch discharged selenium in the concentrations shown in its discharge monitoring reports and that those discharges exceeded the effluent limitations in WV/NPDES Permit WV0093912. (33 U.S.C. §§ 1365(a)(1) & (f); Student Public Interest Research Group of New Jersey v. Monsanto, 600 F. Supp. 1479, 1483 (D.N.J. 1985)).

The Court has also determined that Plaintiffs are entitled to permanent injunctive relief and that a civil penalty must be assessed against Defendants. Doc. # 70 at 49–50. Consequently,

the trial in this matter will be for the purpose of "ascertain[ing] the scope of injunctive relief and the amount of civil penalties to be assessed." Id. at 50.

Under Section 309(d) of the Clean Water Act,

> [i]n determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). Accordingly, Plaintiffs will present evidence on those factors.

Under Section 505(a) of the Clean Water Act, "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce . . . an effluent standard or limitation, or . . . an order." 33 U.S.C. § 1365(a). Similarly, under Section 520(a) of SMCRA, the Court has jurisdiction to compel any person in violation of a SMCRA performance standard. 30 U.S.C. § 1270(a). In its March 31, 2011 Order, the Court evaluated the applicable factors to determine whether Plaintiffs were entitled to a permanent injunction, and concluded that Plaintiffs have made the requisite showing. Doc. # 70 at 49. Accordingly, Plaintiffs will present evidence at trial relevant to how Defendants can achieve compliance with their selenium limitations and in what timeframe.

**(4) Defendants' Statement of Essential Elements**

On March 31, 2011, the Court ruled that the stays issued to Independence and Jack's Branch were legally ineffective to prevent their selenium limits from taking effect on April 5, 2010, as scheduled. In accordance with this ruling, the remaining critical issues include (1) the scope of the injunctive relief, meaning the appropriate means of compliance and (2) the amount of civil penalty Defendants should pay, including the appropriate calculation of economic benefit.

**(5) Plaintiffs' Summary of Material Facts and Theories of Liability**

The Court has already granted Plaintiffs' motion for partial summary judgment with regard to liability, so Plaintiffs will focus in this section on the relief they seek for violations of the three permits at issue in this action.

The federal courts, when assessing civil penalties, consider a violation of an average monthly effluent limitation to be a violation of the limit for each and every day of the month that the violation occurred. See, e.g., Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 791 F.2d 304, 313-15 (4th Cir. 1986), vac'd on other grounds, 484 U.S. 49 (1987). Applying that principle, Defendants' discharge monitoring reports through the first quarter of 2011 reveal that Independence has accrued 634 days of violation of its selenium limits on Outfalls 008 and 015 of WV/NPDES Permit WV1016890 since those limits went into effect in April 2010; that Independence has accrued 1,370 days of violations of the selenium limits in WV/NPDES Permit WV1017152 since those limits went into effect in April 2010; and that Jacks Branch has accrued 2,417 days of violation of the selenium limits in WV/NPDES Permit WV0093912. In sum, Defendants have accrued 4,421 days of violation in the year since their selenium limits became effective.

Courts can use one of two methods to calculate a civil penalty under the Clean Water Act. United States v. Smithfield Foods, Inc., 191 F.3d 516, 528 n.7 (4th Cir. 1999). Under the "top-down" method, the Court "begins with the statutory maximum and adjusts downward based on its evaluation of § 309(d) factors." Id. Here, the statutory maximum for Defendants' 4,421 days of violation is $165,787,500.

Alternatively, a court can use the "bottom-up" method, in which "the court begins with the violator's estimated economic benefit from noncompliance . . . and then adjusts up or down based on the court's evaluation the six factors set out in § 309(d)." Id. Here, Plaintiffs' economic

expert has calculated Defendants' economic benefit of noncompliance with its selenium limits in the three permits at issue to range from $59.5 million to $80.0 million.

Plaintiffs intend to present evidence to establish that Defendants' prolonged period of noncompliance, the seriousness of their violations, and their failure to make any serious efforts to comply justify an upward adjustment to the civil penalty. That evidence will be in the form of Defendants' discharge monitoring reports, testimony from a representative of GE Water and Process Technology regarding Jacks Branch's 2008 pilot test of ABMet technology (and subsequent abandonment of that promising technology), and the testimony of Plaintiffs' engineering expert.

On injunctive relief, Plaintiffs will offer expert testimony that, due to Defendants' prolonged delay in taking steps to comply with its selenium limits, the technology that Defendants apply must be capable of:

1. Consistently meeting the selenium limits, i.e., 4.7 and 8.2 µg/l, respectively, for the average daily and maximum daily limits;
2. Responding to the variations in wastewater flow while continuing to consistently meet the effluent limits;
3. Being installed within the constraints of the outfall site or within a reasonable distance from the site; and
4. Being designed and successfully placed into operation in a minimum amount of time.

Based on the fourth criterion, only technologies that have been previously tested and/or successfully placed into full-scale operation could be acceptable.

Plaintiffs' engineering expert will offer testimony that there are three technologies that meet the above criteria: (1) reverse osmosis, (2) biological treatment using the ABMet process,

and (3) biologicl treatment using a fluidized bed reactor (FBR). Of those three, the FBR is the least costly, and therefore Plaintiffs' evidence of cost will be based on that technology.

**(6) Defendants' Summary of Material Facts and Theories of Liability**

**(a) Injunctive Relief**

Defendants will present the expert testimony of Tom Sandy regarding appropriate injunctive relief. Mr. Sandy is the engineer for CH2M Hill who has evaluated the various selenium treatment alternatives and is the principal author of *Review of Available Technologies for Removal of Selenium from Water*, a comprehensive work detailing pilot projects and studies of selenium treatment systems at surface mine sites. In this 233 page report issued in 2010, Mr. Sandy evaluated over thirty different selenium treatment systems and assessed the pros and cons of each, ultimately concluding that "[n]o single technology has been demonstrated at full-scale to cost-effectively remove selenium to less than 5 ug/L. . . ." As the principal author of this report and the engineer who has overseen various selenium treatment pilot projects, Mr. Sandy is uniquely qualified to explain the current state of selenium treatment for surface mining operations.

Mr. Sandy is expected to testify that all treatment technologies (e.g., physical, chemical, and biological) for selenium removal in the mining industry are still in their early stages of development. Mr. Sandy is expected to testify that Defendants' exploration of treatment options was reasonable and diligent, given the state of industry knowledge prior to 2010. Mr. Sandy is expected to testify that no system—active or natural—has yet been demonstrated to consistently reduce selenium to the water quality standard of 4.7 ppb at a full-scale mine site subjected to variable rainfall events and that there is no one-size-fits-all selenium treatment solution. Mr. Sandy has personally visited the outlets in question, has evaluated and recommended options for

compliance at each outlet, and continues to refine his analyses. In addition, where indicated, Mr. Sandy will be designing and/or implementing pilot and/or full scale testing for the recommended technologies. Mr. Sandy is expected to testify that water management systems and/or basin-based biologic and passive treatment systems are the most cost effective means of compliance for the outlets at issue. Mr. Sandy will further testify that basin-based biologic and passive treatment systems will consistently reduce selenium levels to within compliance limits. He will discuss how he arrived at his compliance recommendations, the costs associated with those recommendations, and the predicted implementation schedules associated with those recommendations. Mr. Sandy will also testify about the costs and drawbacks of other treatment options, including the projected costs and implementation schedule of Fluidized Bed Reactors.

**(b) Civil Penalties**

Congress authorized district courts to assess civil penalties against persons violating the Clean Water Act at 33 U.S.C. § 1319(d). Any person who violates a permit condition in a permit issued under 33 U.S.C. § 1342 shall be subject to a civil penalty not to exceed $37,500 per day for each violation.[1]

Two principle methods for calculating civil penalties for Clean Water Act violations exist: (1) the "top-down" method; or (2) the "bottom up" method.[2] Courts following the "top-down" method first calculate the maximum penalty based on the $37,500 per day figure, then adjust the figure down, as necessary, to account for the six factors listed in § 1319(d).[3] In contrast, the "bottom up" method requires the court to determine the economic benefit the defendant derived by violating the Act, and then adjust that figure upward *or downward* using the remaining five

[1] 33 U.S.C. § 1319(d). The penalty number has been adjusted for inflation. 73 Fed. Reg. 75,340 (Dec. 11, 2008). $37,500 penalty was effective after January 12, 2009. *Id.* Penalty is $32,500 from March 15, 2004 through January 12, 2009. *Id.*

[2] *See United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 528 (4th Cir. 1999).

[3] *Id.* at 528 n. 7.

factors in § 1319(d).[4] However, under the bottom up method, the penalty still cannot exceed the statutory maximum of $37,500 per day for each violation.

The six factors Courts consider to determine the amount of civil penalty are:

(i) the seriousness of the violation or violations,

(ii) the economic benefit (if any) resulting in the violation,

(iii) any history of such violations,

(iv) any good faith efforts to comply with applicable requirements

(v) the economic impact of the penalty on the violator,

(vi) and such other matters as justice may require.[5]

The Fourth Circuit has approved a "bottom-up" approach to calculating these penalties, wherein one begins by calculating economic benefit, then adjusts upward ***or downward*** based on the six factors in 33 U.S.C. § 1319(d).[6]

In *Allegheny Ludlum*, the Third Circuit noted that the economic benefit calculation starts with the costs spent or that should have been spent, to achieve compliance.[7] Once that figure is established, an appropriate calculation on economic benefit should also reflect the time value of money. In order to make that calculation, a court must apply an interest rate to determine the present value of the avoided or delayed cost.[8] The Third Circuit rejected the district court's use of the Weighted Average Cost of Capital ("WACC") and concluded that there are two possible approaches to calculation of economic benefit: (1) the cost of capital; and (2) the actual return on capital.[9] In *Allegheny Ludlum*, the defendant's actual rate of return was less than half the rate that

---

[4] *Id.* at 528.
[5] 33 U.S.C § 1319(d).
[6] *See Smithfield Foods*, 191 F.3d at 528.
[7] *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004).
[8] *Id* (citing *U.S. v. Smithfield Foods Inc.*, 191 F.3rd 516, 530 (4th Cir. 1999)).
[9] *Allegheny Ludlum*, 366 F.3d at 169.

the government's expert witness proposed. The Third Circuit concluded that the application of the government's proposed rate may so vastly overstate the economic benefit to defendant of its improper discharges, that is does not "level the playing field," and that it constitutes an abuse of discretion.[10] The court stated that "discretion is not a license to adopt an opinion based on unsound methodology[.]"[11]

Defendants will challenge Plaintiffs' assertion that there was a prolonged period of non-compliance, the seriousness of the violations, Plaintiffs' contention that Defendants did not make a good faith effort towards compliance, and the appropriate amount of civil penalties. Defendants will offer the opinion of Robert Furhman, an expert economist, that Plaintiffs' expert has greatly overestimated the economic benefit associated with noncompliance.

Defendants will offer the testimony of expert biologist, Dr. Mindy Armstead, concerning harm to the environment. Thomas Cook, Director of Environmental Compliance for Defendants, will testify concerning Defendants' good faith efforts to comply with their selenium limits and their good faith reliance upon the EQB stays. Mr. Cook will also testify about his experience with an ABMet pilot project and his resulting concerns.

**(7) Plaintiffs' Listing of Contested Issues of Fact and Contested Issues of Law Issues of Fact.** Plaintiffs expect to contest the following facts:

a. Whether the seriousness of Defendants' violations justify an upward adjustment to the civil penalty in this case;

b. The amount of the economic benefit to Defendants of their noncompliance with their selenium limits;

c. Whether Defendants' lengthy history of selenium violations justifies an upward adjustment to civil penalty in this case;

[10] *Id*. at 169.
[11] *Id*.

d. Whether the absence of any good faith efforts on the part of Defendants over the past five to seven years to come into compliance justifies an upward adjustment to civil penalty in this case;

e. Whether any of Defendants' proposed treatment plans will achieve compliance as soon as possible, if at all;

f. The amount of time that Defendants will need to achieve compliance as soon as possible;

g. Whether Defendants' biological expert's conclusion that there is no evidence of harm to the biota in the receiving streams is incorrect; and

h. The cost of treatment systems necessary to bring Defendants into compliance with their selenium limits.

i. The extent of flow from each outfall and the amount of that flow that must be treated to achieve compliance with selenium limits.

j. The effect on the streams from Defendants' flow augmentation plans.

k. The effect on the streams of Defendants' plan to pump large quantities of its effluent to the Kanawha River.

**Issues of Law.** The following are the contested issues of law in this action:

a. Whether this action is precluded by 33 U.S.C. § 1365 by the Consent Decree in United States v. Massey Energy Co., 2:07-cv-00299 (S.D. W. Va.). Points and authorities on that question are cited in the parties briefing on Defendants' pending motion for summary judgment.

b. Whether a violation of a monthly average effluent limitation constitutes a violation for each day of that month. See, e.g., Chesapeake Bay Foundation, Inc. v. Gwaltney of

Smithfield, Ltd., 791 F.2d 304, 313-15 (4th Cir. 1986), vac'd on other grounds, 484 U.S. 49 (1987).

c. Whether the use of a Defendants' weighted average cost of capital ("WACC") or a capital-asset pricing model to calculate the Defendants' economic benefit are reasonable and appropriate methodologies. See, e.g., United States v. Smithfield Foods, Inc., 191 F.3d 516, 530–31 (4th Cir. 1999); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 890 F. Supp. 470, 482 n.3 (D.S.C. 1995).

d. Whether, because a precise economic benefit to a polluter may be difficult to prove, reasonable approximations of economic benefit will suffice. United States v. Smithfield Foods, Inc., 191 F.3d 516, 529 (4th Cir. 1999).

e. Whether Defendants' flow augmentation and/or pumping plans comply with state narrative water quality standards and/or the state antidegradation policy. 47 C.S.R. § 2-3 & 2-4.

**(8) Defendants' Listing of Contested Issues of Fact and Contested Issues of Law**

**Issues of Fact.**

a. The amount of the economic benefit accrued to Defendants due to noncompliance with their selenium limits;

b. Whether Defendants' good faith efforts to come into compliance justifies an downward adjustment to civil penalty in this case;

c. Whether Plaintiffs' proposed treatment plan is the most cost effective means of achieving compliance;

d. Whether Plaintiffs' cost estimates for installation of FBR are inaccurate;

e. The amount of time that Defendants will need to achieve compliance;

f. Whether there is evidence of harm to the biota in the receiving streams;

g. The extent of flow from each outfall and the amount of that flow that must be treated to achieve compliance with selenium limits.

h. Whether Defendants' good faith reliance upon the stay orders issued in March of 2010 by the West Virginia Environmental Quality Board justifies a downward adjustment to the civil penalty in this case;.

i. Whether there were any full-scale treatment technologies available to Defendants prior to April 5, 2010 that were demonstrated to treat selenium to the current water quality standard;

j. Whether Plaintiffs' expert testimony concerning the economic benefit of noncompliance should be excluded for the reasons articulated in Defendants' Motion in Limine;

k. Whether Defendants complied with the interim construction deadlines in the DEP amended orders by implementing a pilot project prior to October 5, 2008;

**Issues of Law.** The following are the contested issues of law in this action:

a. Whether it is appropriate to apply a proposed rate of return to calculate the economic benefit associated with past noncompliance where the proposed rate vastly exceeds a defendant's actual rate of return. *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164 (3d Cir. 2004).

b. Whether a violation of a monthly average effluent limitation must be counted as a violation for each day of that month. *See, e.g., United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004); *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 2 F.3d 493 (3d Cir. 1993).

**(9) Plaintiffs' Proposed Stipulations**

Plaintiffs propose the following stipulations, and will work with Defendants to obtain agreement on these points and any that Defendant suggest:

a. The discharge monitoring reports submitted by Defendants from April 2010 through the first quarter of 2011 reveal that Defendants violated their selenium limitations on 340 occasions and, if a violation of a monthly average constitutes a violation each day of the month, then Defendants have accrued 4,421 days of violaton.

b. Defendant discharged effluent with the selenium concentrations indicated in the discharge monitoring reports submitted to the West Virginia Department of Environmental Protection. Appendices to the First Amended Complaint and the discharge monitoring reports attached to the Parties' cross motions for summary judgment for each of the 49 parameters at issue in this action.

**(10) Defendants' Proposed Stipulations**

Defendants are willing to stipulate that they discharged effluent with the selenium concentrations indicated in the discharge monitoring reports submitted to the West Virginia Department of Environmental Protection. Defendants may be able to stipulate to the number of exceedances shown in their discharge monitoring reports prior to trial.

**(11) Plaintiffs' suggestions for the Avoidance of Unnecessary Proof and Cumulative Evidence**

The Parties should stipulate to the facts articulated in section (9). Such will eliminate the need for Plaintiffs to introduce Defendants' discharge monitoring reports and elicit testimony regarding the number of violations. Moreover, testimony from Defendants' biology expert should be limited to her firm's field and laboratory tests related to the specific outfalls and receiving

watershed at issue, and should not include any testimony regarding the merits of the duly promulgated selenium water quality standards.

**(12) Defendants' suggestions for the Avoidance of Unnecessary Proof and Cumulative Evidence**

Defendants may be able to stipulate to the number of exceedances shown in their discharge monitoring reports prior to trial.

**(13) Special Procedures**

At this time, neither Plaintiffs nor Defendants foresee any potentially difficult or protracted aspects of the trial that may involve complex issues, multiple parties, difficult legal questions or unusual proof problems that would require special procedures.

**(14) Voir Dire Questions**

Because this is not a jury trial, this provision is inapplicable.

**(15) Estimate of the Number of Trial Days Required**

Plaintiffs' estimate that the trial should require approximately 3 days. Defendants estimate that trial should require 3-4 days.

**(16) Required Courtroom Technology**

Plaintiffs intend to introduce the transcripts of the video evidentiary depositions of Dr. Jay Stauffer and Phil Rooney, and to play portions of those video depositions at trial. Accordingly, Plaintiffs commit to notifying Court personnel at least seven days prior to the commencement of the trial of the need for video projection technology. Defendants will likewise notify Court personnel at least seven days prior to trial should they need access to video projection technology.

**(17) Other Relevant Matters for Pretrial Discussion or Disposition**

Other than those matters raised above or in Defendant's motion in limine, Plaintiffs and Defendants are unaware of any other matters requiring pretrial disposition at this time. Plaintiffs reserve the right to raise such matters with Defendant and the Court should Plaintiffs become aware of them before trial, and Defendants do likewise.

Respectfully submitted,

**/s/ Derek O. Teaney**____________________
DEREK O. TEANEY (WVSB # 10223)
JOSEPH M. LOVETT (WVSB # 6926)
Appalachian Ctr. for the Economy & the Envt.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax: (304) 645-9008
E-mail: dteaney@appalachian-center.org
*Counsel for Plaintiffs*

**/s/*Christopher M. Hunter***______________________
ROBERT G. McLUSKY, WVBN 2489
CHRISTOPHER M. HUNTER, WVBN 9768
MATTHEW S. TYREE, WVBN 11160
JACKSON KELLY, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
*Counsel for Defendants*